# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

LARRY D. JOHNSON,
o/b/o C.S.G.,                                    Plaintiff,

        v.                                              6:15-CV-179
                                              (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,
                                  Defendant.

_____

MICHAEL J. TELFER, ESQ. and SHUBH NIGAM MCTAGUE, ESQ., for Plaintiff
JASON P. PECK, SPECIAL ASS'T. U.S. ATTORNEY, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

    Plaintiff Larry Johnson filed an application for Supplemental Security Income ("SSI") payments on behalf of his foster son, C.S.G.,[1] on June 8, 2010. (Administrative Transcript ("T.") at 23, 176-82). Plaintiff's application was initially denied on September 8, 2010, and he made a timely request for a hearing before an Administrative Law Judge ("ALJ"). (T. 115-21). The hearing, at which C.S.G. appeared with legal counsel and his foster mother, Circe Johnson, was conducted by ALJ Mary Sparks on June 5, 2012. (T. 67-92).

_____

[1] Throughout this Report, the child on whose behalf this action was brought will be generally referred to as "the claimant" or by his initials "C.S.G." Larry Johnson, who commenced this action on behalf of his foster son, will generally be referred to as "plaintiff."

On July 20, 2012, ALJ Sparks issued a decision finding that C.S.G. was not disabled from the date of his application through the date of her decision. (T. 20-45). ALJ Sparks' decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on December 31, 2014. (T. 1-4).

## II.   ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)    The ALJ erred in her determination that claimant's impairments were not functionally equivalent to "the listings." (Pl.'s Br. at 12-22) (Dkt. No. 11).

(2)    The ALJ's credibility findings regarding claimant's foster mother were not supported by substantial evidence. (Pl.'s Br. at 22-24).

(3)    The ALJ failed to properly consider how claimant functioned outside of a structured or supportive setting. (Pl.'s Br. at 11-12).

Defendant argues that the Commissioner's decision is supported by substantial evidence, and the complaint should be dismissed. (Def.'s Br. at 4-19) (Dkt. No. 13). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III.   FACTUAL OVERVIEW

The court will only briefly summarize the medical, educational, and other evidence, which is set forth at length in plaintiff's brief (Pl.'s Br. at 2-8) and in the ALJ's decision. (T. 26-40). Further relevant details are discussed below in the course of analyzing the issues disputed by the parties.

Claimant C.S.G. is a male child, born in May 2001. (T. 26, 176). C.S.G. was nine years old on the date when his application for benefits was filed. (T. 176). C.S.G.'s family has a history of mental illness, including his biological mother. (T. 290, 487). At the date of the hearing, he lived with his foster parents, and had regular weekend visitation with his biological mother. (T. 313). C.S.G. also saw his older brother, who lived with a separate foster family, on a regular basis. (T. 86).

Since the third grade, C.S.G. was enrolled in 12:1:1 special education classes[2] for reading and mathematics. (T. 246, 461). His Individualized Education Plan ("IEP") also allowed for testing accommodation, including additional time for tests, simplified instructions and having questions and responses read to him, and getting frequent breaks during testing. (T. 246-48). In 2011-12, C.S.G.'s IEP for the fifth grade was revised to include 12:1:1 classes for all subjects. (T. 476).

C.S.G. began medication to control his attention deficit hyperactivity disorder ("ADHD") at age four, and had been receiving outpatient services at the same counseling center since 2007. (T. 26, 368). He was hospitalized in January 2010 after episodes of aggression at home and school, and delusional thinking including hallucinations. (T. 26, 308-43). These symptoms had improved significantly since that date, changes that his treating providers attributed to refinement of his medication and the supportive environment of his foster parents. (T. 377, 442). While C.S.G. still had difficulties with focus and concentration, his teachers and treating providers saw

---

[2] A 12:1:1 classroom contains a total of twelve students, one teacher, and a paraprofessional aide. (T. 266).

corresponding improvement in his academic performance.  (T. 505).

## IV.   APPLICABLE LAW

### A.   Disability Standard

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(C)(i).  *See Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *3-4 (N.D.N.Y. Apr. 30, 2009) (discussing the standard for children's disability benefits).  However, the definition provision excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity. . . ."  42 U.S.C. § 1382c(a)(3)(C)(ii).

The agency has developed a three-step process to be employed in determining whether a child can meet the statutory definition of disability.  20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).  The first step of the test requires a determination of whether the child has engaged in substantial gainful activity.  20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488.  If so, then by statute and by regulation, the child is ineligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the test requires examination of whether he or she suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the child is found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1. *Id.* Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed impairment, and the twelve-month durational requirement is satisfied, the claimant will be found to be disabled. 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

"Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or medically equal the criteria for a listed impairment. Analysis of functionality involves considering how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and

manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established by finding an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence

in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983);

*Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ

explicitly to reconcile every conflicting shred of medical testimony).  However, the

ALJ cannot "'pick and choose' evidence in the record that supports his conclusions."

*Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No.

09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## V.    THE ALJ'S DECISION

As the first step in his analysis, the ALJ found that C.S.G. had not engaged in

substantial gainful activity since June 8, 2010, the filing date of the application for

benefits.  (T. 383).  Next, the ALJ determined that plaintiff's ADHD and adjustment

disorder constituted severe impairments.  (*Id*.).

At the third step, the ALJ found that C.S.G. did not have an impairment or a

combination of impairments that met or medically equaled an impairment listed in 20

C.F.R. § 404, Subpt. P, App. 1. (T. 28).  The ALJ continued her analysis and found

that C.S.G. did not have an impairment or combination of impairments that

functionally equaled the severity of a Listed Impairment under the Regulations. (T. 28-

40).

In making his functional equivalence determination, the ALJ considered the

medical evidence, C.S.G.'s school records, and the hearing testimony. (*Id*.).  Based

upon his review of the evidence, the ALJ found that C.S.G. had a "less than marked

limitation" in the functional domains of acquiring and using information, attending

8

and completing tasks, interacting and relating with others, and health and physical well-being. (T. 30-37, 39-40).  The ALJ further concluded that C.S.G. had no limitation in the functional domains of moving about and manipulating objects and caring for himself. (T. 37-39). The ALJ cited C.S.G.'s intelligence evaluation scores, standardized achievement test results, and the special education mandated by his IEP as supporting these finding. (T. 30-40).  The ALJ also considered the opinions of state agency consultants for pediatrics and psychiatry, treatment notes from C.S.G.'s counselor at Family Counseling Services, the evaluation reports from the school psychologist and several of C.S.G.'s teachers, relying upon each according to its consistency with the overall record.  (*Id*.).

The ALJ also evaluated C.S.G.'s foster mother's hearing testimony, and concluded that her statement that his medications were "helping him function 'the best he has in a long time'" was consistent with the medical evidence.  (T. 29).  However, the ALJ found that the foster mother's testimony regarding more serious limitations, particularly with regard to attention problems, were not consistent with the record that showed that C.S.G's ADHD symptoms had improved with medication.  (*Id*.).  Because C.S.G. did not have "marked" limitations in two or more of the functional domains, and did not have an "extreme" limitation in any one domain, the ALJ concluded that C.S.G. was not disabled from the date of his application for benefits. (T. 40).

## VI. ANALYSIS

### A. Functional Domains

As discussed above, if the claimant's condition does not meet or medically equal a specifically listed impairment, the ALJ must determine whether claimant has an impairment or combination of impairments that functionally equals a listing. The functional equivalence determination is based upon an analysis of the six domains listed above. 20 C.F.R. § 416.926a(b)(1). Marked limitations in more than one domain would functionally equal the listings and require a finding that the claimant is disabled. 20 C.F.R. § 416.926a(d).

Plaintiff argues that the ALJ's determination of functional equivalence is not supported by substantial evidence due to an improper evaluation of C.S.G.'s limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. (Pl.'s Br. at 13-22). A marked limitation in any two of these four domains, or an extreme limitation in any one of these domains, would render C.S.G.'s condition "functionally equivalent" to the listings, and C.S.G. would qualify as disabled.

### 1. Acquiring and Using Information

In assessing the domain relating to acquiring and using information, the ALJ must consider how well a child acquires or learns information, and how well he can use the information he has learned. 20 C.F.R. § 416.926a(g). A school-age child (*i.e.* at least six, younger than twelve) should be able to read, write, perform math, and

discuss history and science.  The child should be able to demonstrate these skills both in academic situations and in daily living.  20 C.F.R. § 416.926a(g)(2)(iv).  He should be able to use increasingly complex language to share information and ideas with individuals or groups, by asking questions and expressing his own ideas, and by understanding and responding to the opinions of others.  The applicable regulations provide examples of limited functioning with respect to this domain.  For example, a child might have limited functioning if he does not demonstrate understanding of words about space, size, or time; cannot rhyme words or the sounds in words; has difficulty recalling information learned in school the previous day; has difficulty solving mathematical problems; and/or talks in short, simple sentences and has difficulty explaining what he or she means.  20 C.F.R. § 416.926a(g)(3).

In finding that the claimant had less than marked limitations in this domain, the ALJ assigned significant weight to the opinions of state agency consultants Dr. Bostic and Dr. Martin, who reached the same conclusion in September 2010.[3]  Bostic and Martin noted that C.S.G. was in a 12:1:1 special education class for Language Arts and Math, and Consultant Speech Services on an as needed basis for a moderate stuttering delay. (T. 244, 392).  They further noted that C.S.G.'s scores on the Woodcock-Johnson Tests of Achievement ranged from 87-104, which the ALJ concluded were mostly at grade level.  (T. 31, 392).  C.S.G.'s last cognitive

---

[3] *See* 20 C.F.R. § 416.927(f)(2) (ALJs must consider the findings of state agency medical consultants and other program physicians because they are highly qualified and are also experts in Social Security disability evaluations); *Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) (the opinions of non-examining sources may override treating sources' opinion provided if they are supported by evidence in the record).

assessment in 2008 showed scores in the low average to average range. (T. 392).

Plaintiff contends that the ALJ's reliance on the Bostic and Martin report is erroneous because it ignores more recent developments, including C.S.G..'s placement in 12:1:1 classes for all subjects. (Pl.'s Br. at 16). However, enrollment in special education classes does not, in and of itself, warrant a finding of disability. *Walker ex rel. J.B. v. Astrue,* No. 1:06-CV-1180 (NAM), 2010 WL 2287566, at *10 (N.D.N.Y. June 3, 2010) (citing *Duran v. Barnhart,* No. 01 Civ. 8307, 2003 WL 103003, at *11 (S.D.N.Y. 2003). The ALJ also took these more recent developments into account by considering the treatment notes of N.P. LoCascio in 2010 and 2011, that found that C.S.G. was "flourishing" since living with the Johnsons, including improvement at school. (T. 31, 377, 434, 440, 487). C.S.G. was also responding well to his medication after it was adjusted. (T. 32, 440, 444). The ALJ also found improvement in C.S.G's most recent report cards and achievement tests, although she also recognized, consistent with the school psychologist's findings, that C.S.G. was still not performing in the classroom at a level consistent with his test scores. (T. 32, 464).

Plaintiff contends that N.P. LoCascio's findings should have been assigned no weight because her findings that C.S.G. was doing well with his new foster parents and improving at school were not indicative of the severity of C.S.G.'s symptoms. (Pl.'s Br. at 16). Plaintiff notes in particular the visual and auditory hallucinations that required hospitalization in January 2010. (*Id*.). As stated above, it is the province of the ALJ to resolve conflicts in the evidence. *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008). Taking such deference into account, this court finds that the ALJ's

consideration of N.P. LoCascio's treatment notes, that covered the period shortly after

C.S.G.'s hospitalization through October 2011 (T. 370-78, 434-53, 481-88), was

supported by substantial evidence.  N.P. LoCascio's findings took C.S.G.'s history of

hallucinations into account, as well as an incident when he grabbed a classmate by the

neck to keep him from "tattling" on him. (T. 27, 368).   LoCascio also evaluated

C.S.G.'s reaction to adjustments in his medicine, and observed improvements in his

concentration as well as a reduction in side effects, such as fatigue. (T. 436).  After

April 2010, LoCascio's notes show few incidents of hallucinations, with the exception

of a "headless man" that C.S.G. saw outside his window after a stressful incident with

his mother in August 2011.  (T. 485).  When questioned about it shortly thereafter,

C.S.G. did not recall the incident.  (*Id*.)  LoCascio's findings were not based solely on

her own direct examination of claimant, but also statements and reports from his

teachers, mother, foster mother, and C.S.G. himself. (T. 434, 436, 485).

Plaintiff also argues that the ALJ erred by not assigning significant weight to

the January 27, 2012 opinion of C.S.G.'s teacher, Ms. Fagel. (T. 489-96).  The opinion

of teachers and other non-medical sources are not entitled to controlling weight, but

can be used as a valuable source of evidence in assessing the severity of an

impairment and any resulting functional limitations. *Reid v. Astrue*, No. 07-CV-577

(LEK), 2010 WL 2594611 at *5, n.4 (N.D.N.Y. June 23, 2010).  Plaintiff correctly

points out that the ALJ did not assign any specific weight to Ms. Fagel's evaluation.

(T. 30, 33).  However, while it is "preferable" for an ALJ to explain the weight

assigned to teacher opinions, there is no error so long as the ALJ provides adequate

13

discussion of the evidence to allow a claimant or the court to follow her reasoning. *Abdulsalam v. Comm. of Soc. Sec.*, No. 5:12-CV-1631 (MAD), 2014 WL 420465, at *5 (N.D.N.Y. Feb. 4, 2014).

Here, it is clear that the ALJ considered Ms. Fagel's opinion in its entirety. (T. 33). As to this domain, Ms. Fagel noted that "[C.S.G.'s] ability to focus and attend in class greatly affect [his] progress academically," and she identified "obvious" problems in "providing organized oral explanations and adequate descriptions" and "expressing ideas in written form." Ms. Fagel otherwise found only slight problems in this domain. (T. 490). In addition, Ms. Fagel's evaluation was made on a simple form that allowed circled ratings ranging from "no problem "to "a very serious problem" for various activities, with limited space for explanation or supporting documentation. (T. 490-96). Plaintiff's contention, that the "obvious" limitations found by Ms. Fagel in a special education classroom would equate to marked or extreme limitations in a regular class setting, is not supported by the documentation or the caselaw. *See, e.g., Crouch ex rel. K.C. v. Astrue*, No. 05:11-CV-820, 2012 WL 6948678, at *7 (N.D.N.Y. Dec. 31, 2012), *Rep.-Rec. adopted by* 2012 WL 36547 (N.D.N.Y. Jan. 28, 2012) (finding no support for contention that "serious problem" rating on teacher questionnaire equated to "marked" limitation under Social Security regulations).

The ALJ must set forth the essential considerations upon which the decision was based with sufficient specificity so as to enable the reviewing court to determine whether the disability determination was supported by substantial evidence. However, an ALJ is not required to explicitly set forth and analyze every piece of conflicting

14

evidence in the record. *See, e.g., Mongeur*, 722 F.2d at 1040; *Miles,* 645 F.2d at 124. Here, even where the record evidence showed that C.S.G. still had difficulties focusing in class and required additional academic support, this court finds that the ALJ adequately assessed the relevant portions of the record and her finding that the claimant's limitations in the acquiring/using information domain were less than marked is supported by substantial evidence. *See, e.g., Hudson*, 2009 WL 1212114, at *6-7 (upholding an ALJ's finding of a less than marked limitation with respect to acquiring and using information, notwithstanding the conclusion of claimant's teachers that he had some "serious" and "very serious" cognitive limitations, because it was supported by substantial evidence from educational records, standardized testing, and the opinion of claimant's treating psychiatrist); *Torres v. Commissioner*, 09 CV 59, 2010 WL 2674543, at *7 (E.D.N.Y. June 30, 2010) (upholding Commissioner's finding that claimant, who received some special education instruction and had a low average IQ score that fell within two standard deviations of the mean, had less than marked limitations in acquiring and using information).

### 2.    Attending and Completing Tasks

In this domain, the Commissioner considers the child's ability "to focus and maintain . . . attention," and how well he can "begin, carry through, and finish . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h).  The regulations provide that a school-age child is expected to focus attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom

15

and homework assignments. The child should be able to concentrate on details and not make careless mistakes in work, beyond what would be expected in other children of like age who do not have impairments. The child should be able to change activities or routines without distracting himself/herself or others, and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read independently, and complete family chores. The child should also be able to complete a transition task – *e.g.*, to be ready for the school bus, change clothes after gym, and change classrooms – without extra reminders and accommodation. 20 C.F.R. § 416.926a(h)(2)(iv).

The applicable regulations provide examples of limited functioning with respect to attending and completing tasks, including when a child (i) is easily startled, distracted, or over-reactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest–*e.g.*, games or art projects; (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; or (v) requires extra supervision to remain engaged in an activity. 20 C.F.R. § 416.926a (h)(3).

The ALJ noted that the record revealed that C.S.G. had some difficulties paying attention and following his lessons, but concluded that these problems did not rise to the level of marked limitation in attending and completing tasks. (T. 34-35). For example, his I.E.P. for 2011-12 found that C.S.G. regularly got distracted when left to work independently, and that he did better with individual attention or in a small

16

group. (T. 35, 245). On February 1, 2012, the Committee on Special Education found that C.S.G. had made steady growth during the prior year, but that his level of distractibility continued to adversely affect his academics. (T. 35, 505). His 2012-13 IEP gave C.S.G. testing accommodations including additional time, regular breaks, and having the tests read to him. (T. 517-20).

These findings were consistent with teacher evaluations and a 2011 report by the school psychologist, that found that C.S.G. had difficulty paying attention and focusing in a large group, and performed better in a small group. (T. 35, 462-63, 490-92). Ms. Fagel, C.S.G.'s special education teacher, also noted that C.S.G. still needed to be directed to work four to six times per hour, regardless of subject area. (T. 491). Her evaluation found a slight problem carrying out single step instructions and paying attention when spoken to directly, and obvious problems in refocusing to task when necessary, organizing his material, completing his assignments, and completing work accurately without mistakes. (T. 35, 491). She found a very serious problem in focusing long enough to finish assigned activities and a serious problem working without distracting himself or others, and working at a reasonable pace. (T. 491).

The ALJ considered all of these findings, but also relied upon the findings of N.P. LoCascio, who reported in April 2011 that, since his medication had been adjusted, that C.S.G. "is just completely changed for the better. He states that he feels a lot better; he can focus and concentrate in school. He is not laying down, putting his head on the desk and he states that he feels that the medication change helped him a lot." (T. 35, 436). LoCascio also found that claimant was "bright and interactive"

17

during her evaluation, consistent with teacher reports that "there is a glimmer of the old [C.S.G.] coming back." (T. 35, 434).

Even with the ALJ's recognition of the concentration difficulties attributable to claimant's ADHD, there is substantial evidence supporting her conclusion that C.S.G.'s limitations were less than marked with respect to the domain of attending and completing tasks. *See, e.g., Hudson*, 2009 WL 1212114, at *8-9 (upholding the ALJ's finding that claimant's limitations in attending and completing tasks were less than marked, despite observations about some "serious" problems in related areas by teachers, because the ALJ's conclusion was supported by substantial evidence, including medical opinion that claimant's attention span was "fine" while on medication); *Torres*, 2010 WL 2674543, at *7 (while the record indicates the child claimant had some difficulty following instructions and dealing with frustration, educational records indicated these issues could be addressed through constant reinforcement and guidance, and were less than marked); *Gomes v. Astrue*, 633 F. Supp. 2d 171, 185-86 (S.D.N.Y. 2009) (affirming finding that claimant diagnosed with ADHD had less than marked limitations with respect to attending and completing tasks, where, *inter alia*, claimant responded well to re-direction).

### 3.    Interacting and Relating With Others

In this domain, the Commissioner considers the child's ability to "initiate and sustain emotional connections with others, develop and use the language of [her] community, cooperate with others, comply with rules, respond to criticism, and respect

and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations provide that a school-age child is expected to develop lasting friendships with children her age, begin to understand how to work in groups to create projects and solve problems, and have an increasing ability to understand another's point of view and to tolerate differences. A school-age child "should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand." 20 C.F.R. § 416.926a(i)(2)(iv).

The regulations provide examples of limited functioning with respect to this domain. A child might have limited functioning if she does not reach out to be picked up and held by a care giver; has no close friends; avoids or withdraws from people that she knows, or is overly anxious or fearful of meeting new people or trying new experiences; has difficulty playing games or sports with rules; has difficulty communicating with others or in asking others for assistance; or has difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i)(3).

In considering this functional domain, the ALJ again relied upon N.P. LoCascio's progress reports that C.S.G. was doing extremely well and showing significant improvement since he began living with the Johnsons and had his medication successfully adjusted. (T. 37, 377, 436, 438, 440, 442). Beyond the one incident where he grabbed a classmate by the throat to keep him from tattling, C.S.G.'s school records did not document any significant behavioral issues at school, such as frequent detentions or out of school suspensions for fighting or bad behavior. (T. 368). Ms. Fagel, C.S.G.'s special education teacher, observed no problems in this domain,

although a behavior plan was implemented to reward him for time spent focused on tasks. (T. 37, 492).

The ALJ also considered the 2011-12 I.E.P. description of C.S.G.'s limited interaction with his peers, but noted that he did have two close friends with whom he played at school. (T. 37, 85, 90, 468). While C.S.G. had difficulties interacting in large groups, he related well to adults in small group settings, and would initiate a conversation about himself or his schoolwork. (T. 37, 472). While his records showed some difficulties with a stutter, C.S.G. was not in formal speech therapy, and received consultant speech services under his IEP on an as needed basis. (T. 37,392, 512).

This record is consistent with C.S.G.'s hearing testimony, during which he described playing basketball with friends at school and doing activities with his brother outside of school, but testified that he did not know any kids in his neighborhood. (T. 90). Ms. Johnson testified that C.S.G. had never had any children over to their house to play, and had a difficult time interacting with his peers at a classmate's birthday party, but did participate in a basketball clinic over the summer. (T. 85-86).

In the light of the foregoing, this court finds that the ALJ's determination that C.S.G. suffered from a less than marked impairment in the domain of interacting and relating with others was supported by substantial evidence.

### 4. Caring for Oneself

In this domain, the Commissioner considers how well the child maintains a

healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). The regulations provide that a school-age child should be independent in most day-to-day activities, such as dressing and bathing, although he may still need to be reminded sometimes to do these routinely. The child should begin to recognize that he is competent in doing some activities and that he has difficulty with others, and should be able to identify those circumstances when he feels good about himself and when he feels bad. He should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. He should begin to demonstrate consistent control over his behavior, should be able to avoid behaviors that are unsafe, and should begin to imitate more of the behavior of adults that he knows. 20 C.F.R. § 416.926a(k)(2)(iv).

The regulations provide examples of limited functioning in this domain. A child may have limited functioning if he continues to place non-nutritive or inedible objects in his mouth; often uses self-soothing activities showing development regression, such as thumb sucking, body rocking, or head banging; does not dress or bathe himself appropriately for his age; ignores safety rules or engages in self-injurious behavior such as a suicidal thoughts or actions, self-inflicted injury or refusal to take medication; does not spontaneously pursue enjoyable activities or interests; or has disturbances in eating or sleeping patterns.

In finding no limitations in this domain, the ALJ relied upon Ms. Fagel's report

that C.S.G. had no issues caring for himself.  (T. 39).  While the ALJ's analysis for this particular domain is strikingly limited, it is consistent with the record evidence evaluated throughout the remainder of her determination, and thus supported by substantial evidence. (T. 28-39).

Plaintiff cites C.S.G.'s history of hallucinations, as well as enuresis[4], rocking back and forth, and other self-soothing behaviors, as indicative of a marked or extreme limitation in this domain.  (Pl.'s Br. at 21-22).  As noted in the ALJ's determination, C.S.G. had shown significant and recognizable improvement in all these areas since his hospitalization in 2010.  (T. 31-32, 35).  C.S.G.'s treating providers and teachers attributed this improvement to a modification of his medication and his living environment with the Johnsons for the past two years. (T. 436).  The only significant other issue raised by plaintiff in this domain involved C.S.G.'s weekend visits with his biological mother.  (T. 83).  Ms. Johnson testified that during these visits, she believed that C.S.G. went three days without having bathed or brushed his teeth, and often returned on Sunday wearing the same clothes that he wore on Friday, despite having other clothes available. (T. 83).  At the hearing, Ms. Johnson attributed these problems to C.S.G.'s mother's own difficulties with mental illness, and plaintiff's counsel has not alleged any record evidence to refute this conclusion.

In the light of the foregoing, this court finds that the ALJ's determination that C.S.G. suffered from a less than marked impairment in the domain of caring for

---

[4] The ALJ discussed C.S.G.'s history of enuresis and improvements after consulting a urologist in her discussion of the domain of health and physical well-being. (T. 39-40).

himself was supported by substantial evidence.

## B.     Credibility Assessment

### 1.     Legal Standard

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms,

the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

When the claimant is a child, the ALJ is free to accept or reject the testimony of the child's parent or guardian. *Williams*, 859 F.2d at 260. If the child is unable to adequately describe his symptoms, the ALJ will accept the description provided by the testimony of the person most familiar with the child's condition. *Hamedallah ex rel. E.B. v. Astrue*, No. 3:11-CV-939, 2012 WL 2403518, at *16 (N.D.N.Y. June 25, 2012) (citing *Jefferson v. Barnhart*, 64 F. App'x 136, 140 (10th Cir. 2003)). However, the regulations discussing "symptoms" specifically state that "[y]our statements (or those of another person) alone, . . . are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 416.928(a). The ALJ must make specific findings regarding the parent's credibility as if the child were testifying himself. *Id. See also Brummett ex rel. L.R. v. Astrue*, No. 5:10-CV-384, 2012 WL 432099, at *6-7 (N.D.N.Y Feb. 10, 2012) (evaluating credibility of claimant's mother). The determination must be sufficiently specific to make "clear" the weight afforded to the testimony and the reasons for that weight. SSR 96-7p, 61 Fed. Reg. 34483, 34484

(July 2, 1996).  A strong indication of credibility of an individual's statements is their consistency, "both internally and with other information in the case record." *Hamedallah*, 2012 WL 2403518, at *17 (citing SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996)).

### 2.   Application

C.S.G. and his foster mother, Ms. Johnson, testified at the hearing.  (T. 71-91). Plaintiff contends that the ALJ discounted Johnson's testimony without adequately explaining his reasons for doing so. (Pl.'s Br. at 22-23).  This court disagrees.  In his decision, the ALJ reviewed the witness testimony in detail.  (T. 29).  C.S.G. had lived with plaintiff and Ms. Johnson for the past two years.  Ms. Johnson discussed C.S.G.'s academic difficulties in his current fifth grade class, including reading at a third grade level and doing math at a fourth grade level. (T. 29).  Ms. Johnson also described C.S.G.'s problems with hallucinations, difficulties discerning video games from reality, but noted that his current medications allowed him to function "the best he has in a long time."  (T. 76-77).  Ms. Johnson said that despite these improvements, C.S.G. still had difficulty paying attention, comprehending what he read, and retaining information.  Ms. Johnson also testified that C.S.G. used to have panic attacks if he heard an unexpected noise in the house, but that he has been doing very well at home because they try to maintain a structured setting.  (T. 77).  Still, C.S.G. typically had difficulty adjusting when he returned from weekend visits with his biological mother. (T. 82-84).  His foster parents also had to take steps to reduce his anxiety, such as driving him to school each day due to C.S.G.'s worries about the school bus.  (T. 84).

Ms. Johnson also testified that while C.S.G. had two friends at school and regularly visited with his brother, he still had difficulty interacting with his peers, including at a classmate's recent birthday party. (T. 85-86).

The ALJ concluded that Ms. Johnson's testimony that his current medication allowed C.S.G. to function "the best he has in a long time" was credible, but pointed to inconsistencies in her testimony with other record evidence. (T. 29). Particularly, the ALJ relied upon the notes from N.P. LoCascio from December 3, 2010 on, that demonstrated that C.S.G. was doing "extremely well" at home and in school since his medication was adjusted. (T. 444). For example, C.S.G.'s long-standing problems with fatigue and concentration were significantly resolved when LoCascio reduced the dosage of one medication that C.S.G. said made him sleepy. (T. 436). LoCascio, who had been treating C.S.G. since 2009, also commented on the significant improvements in C.S.G's behavior and demeanor since he began living with the Johnsons. (T. 377, 438). Such comparisons are an appropriate method of assessing credibility. *See, e.g., Lanzo ex rel. J.I.C. v. Astrue*, 10-CV-271S, 2012 WL 838921, at *6 (W.D.N.Y. Mar. 12, 2012) (upholding ALJ's finding that mother's testimony lacked credibility when inconsistent with the clinical evidence in the record). An ALJ's assessment of a parent's credibility may be brief so long as, in the context of the case, it is sufficient. *Lanzo*, 2012 WL 838921 at *6. In this case, the ALJ appropriately compared the hearing testimony to the medical evidence in the record and concluded that, to the extent that there was a conflict, the testimony was not credible. Therefore, this court finds that the ALJ's credibility assessment was supported by substantial evidence.

### C.    Structured & Supportive Setting

#### 1.    Legal Standard

*"*[T]he Commissioner's regulations require the ALJ to consider the effects of a structured or highly supportive setting . . . on the claimant's functioning and, if the claimant's symptoms or signs are controlled or reduced by the structured environment, the ALJ is required to consider the claimant's functioning outside of the highly structured setting."). *See, e.g.,Smith v. Massanari*, 00-CV-0402C, 2002 WL 34242375, at *6 (W.D.N.Y. Mar. 17, 2002)*; Hudson v. Astrue*, 2009 WL 1212114, at *10-11; 20 C.F.R. § 416.924a(b)(5)(iv).  While the ALJ must consider these factors, "[t]he regulation does not command the ALJ to explicitly discuss his consideration." *Shatraw v. Astrue*, No. 7:11-CV-13 (GLS), 2012 WL 589667, at *4 (N.D.N.Y. February 12, 2012) (quoting *Watson v. Astrue*, No. 07-CV-6417T, 2008 WL 3200240, at *5 (W.D.N.Y. August 5, 2008)).

#### 2.    Application

Plaintiff contends that the ALJ's functional domain analysis is generally flawed because the ALJ failed to adequately consider C.S.G.'s ability to function outside the structured settings of his special education classroom and the structured environment of the Johnson home. (Pl.'s Br. at 11-12).  However, the ALJ's decision and the hearing transcript demonstrate that the ALJ properly considered whether C.S.G. could function outside of the supportive special education and foster care environment.  For example, the ALJ considered C.S.G.'s report cards and academic testing in third and

fourth grade regular classes, as well as smaller special education classes (T. 29). She also conducted a broad review of the record that documented C.S.G.'s ability to function in a variety of structured and non-structured settings: at the Johnsons' home, as well as the homes of his previous foster parents and his biological mother; in small and large groups at school; in his neighborhood; at a youth basketball clinic; at medical evaluations; and during C.S.G.'s own hearing testimony. (T. 26-27, 31-33, 82-83, 85-86). During the hearing, the ALJ questioned C.S.G. and his mother about his interactions with classmates, with his brother, and his teachers. (T. 85-86, 88-91). Therefore, the ALJ satisfied her obligation under the regulations to consider C.S.G.'s functioning outside of structured settings, and her determination as to C.S.G.'s functional limitations was supported by substantial evidence.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the Commissioner's decision be AFFIRMED, and the plaintiff's complaint DISMISSED.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have FOURTEEN (14) DAYS within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:      January 19, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge